UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Camelot Banquet Rooms, Inc.;
Downtown Juneau Investments, LLC;
Midrad, LLC; and
PPH Properties I, LLC;

        Plaintiffs,

      v.                                  Case No. 20-cv-601

United States Small Business Administration;
Jovita Carranza, in her official capacity as
Administrator of the Small Business
Administration; United States of America; and
Steven Mnuchin, in his official capacity as
United States Secretary of Treasury,

        Defendants.

J.R. Schuster, LLC;

        Plaintiff,

      v.                                  Case No. 20-cv-623

United States Small Business Administration;
Jovita Carranza, in her official capacity as
Administrator of the Small Business
Administration; United States of America; and
Steven Mnuchin, in his official capacity as
United States Secretary of Treasury,

        Defendants.

**DEFENDANTS' BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## INTRODUCTION

Plaintiffs' case rests entirely on the notion that the Government is constitutionally obligated to subsidize their speech. They couldn't be more wrong. As the Supreme Court held in *Regan v. Taxation With Representation of Washington,* 461 U.S. 540 (1983), and has repeatedly reaffirmed ever since, the Government is not required to remove obstacles in the path of a person's exercise of free speech that are not of the Government's own creation. Therefore, as also held in *Regan,* the First Amendment does not compel the Government to subsidize speech of any kind, on any topic, that the Government does not wish to promote. These are the principles that control this case, and they require that Plaintiffs' motion for a preliminary injunction be denied, just as the District Court for the District of Columbia denied a similar motion, filed by political consultants and lobbyists, only days ago. *See Am. Ass'n of Political Consultants v. SBA*, 2020 WL 1935525, No. 1:20-cv-00970 (RCL) ("*AAPC*") (D.D.C. Apr. 21, 2020)(denying motion for TRO and preliminary injunction).[1]

Plaintiffs are establishments engaged in the business of presenting what they describe as "erotic dance entertainment" that is done in "costumes" designed to cover narrow parts of the performers' anatomy or is "semi-nude or nude," depending on the specific business location. (*See* ECF No. 1, ¶¶ 401, 403.) They challenge the constitutionality of a regulation, issued by the Small Business Administration ("SBA") almost 25 years ago, 13 C.F.R. § 120.110(p), providing that businesses selling products or services, or presenting depictions or live performances, of a "prurient sexual nature" (as well as 17 other types of businesses designated under the rule) are ineligible for SBA general business loans. The SBA adopted this rule in furtherance of its statutory

---

[1] A copy of this decision is on file with the Court as Exhibit B to the United States's Response to Plaintiffs' Motion to Clarify Temporary Restraining Order in Case No. 20-cv-601. (*See* EDWI Case No. 20-cv-601, ECF 22-2.)

1

mandate to consider the public interest when directing its limited resources, and without abridging the freedom of such establishments to use their own funds to operate their businesses and express their views. Plaintiffs nevertheless contend that application of this longstanding rule to deny businesses of a prurient of sexual nature access to economic relief under the Paycheck Protection Program ("PPP") of the Coronavirus Aid, Relief, and Economic Security (CARES) Act infringes upon their First and Fifth Amendment rights. Plaintiffs seek preliminary injunctive relief prohibiting the SBA from applying section 120.110(p) to refuse to guarantee their PPP loans.

Plaintiffs' motion should be denied. First, none of their constitutional claims is likely to succeed on the merits. Section 120.110(p) is not, as Plaintiffs maintain, a content-based prohibition of speech. As the Supreme Court has explained, the Government does not ban, penalize or otherwise infringe on speech simply by deciding not to fund it, and is entitled to make content-based judgments about the speech it will and will not fund so long as (like here) it does not engage in invidious viewpoint discrimination, or attempt to suppress the expression of particular ideas. Nor does section 120.110(p) violate the doctrine of unconstitutional conditions, constitutional standards concerning obscenity, the rule against prior restraints, or the vagueness doctrine, because it merely prohibits the use of SBA loans to fund private speech that the Government does not wish to subsidize, while leaving businesses of a prurient sexual nature entirely free to use their own financial resources to engage in any speech they wish. Section 120.110(p) is also consistent with principles of Equal Protection, and does not interfere with Plaintiffs' asserted right to "occupational liberty." Just as the Government rationally may decide that it is not the best use of limited public funds to subsidize lobbying, as held in *Regan* and *AAPC*, so too it may decide it is not in the public interest to subsidize businesses of a prurient sexual nature. Plaintiffs' claim that the CARES Act prohibits application of section 120.110(p) under the

PPP also fails.  When Congress designed the PPP, it modified a number of SBA regulations for purposes of the program, but did not see fit to waive or modify SBA's policy concerning businesses of a prurient sexual nature.

Although the legal deficiency of Plaintiffs' claims alone requires that their request for preliminary relief be denied, as discussed below their conclusory and unsubstantiated claims of "ruination" are insufficient to make the requisite showing of irreparable harm attributable to the SBA's rule.  Moreover, they have not shown that awarding the relief they seek would be in the public interest.  When it designed the PPP, Congress modified a number of SBA rules and regulations for purposes of the program, but did not see fit to waive or modify SBA's policy concerning businesses of a prurient sexual nature.  Plaintiffs offer no justification for disregarding that legislative judgment, when the effect would be to deny finite funds to other businesses and individuals whose need for economic assistance in this time of crisis is just as great, if not more so, than Plaintiffs'.

## BACKGROUND

### The Small Business Administration

The declared policy of the Government under the Small Business Act, 15 U.S.C. § 631 *et seq.*, is to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns," in order to preserve the system of free competitive enterprise that is "essential" to the economic well-being and security of the Nation.  15 U.S.C. § 631(a).  To promote that important national objective, Congress created the Small Business Administration ("SBA"), under the management of a single Administrator, *id.* § 633(a), (b)(1), who is given "extraordinarily broad powers" under section 7(a) of the Act, 15 U.S.C. § 636(a), to provide a wide variety of technical, managerial, and financial assistance to small-business concerns.  *See SBA v. McClellan*, 364 U.S.

3

446, 447 (1960); *see generally* 15 U.S.C. § 636(a)(describing numerous varieties of general small-business loans the Administrator is "authorized" and "empowered" to make); 13 C.F.R. § 120.1. In the performance of these authorized functions the Administrator is further empowered to "make such rules and regulations as [she] deems necessary to carry out the authority vested in [her]," and in addition to "take any and all actions … [that] [she] determines . . . are necessary or desirable in making . . . loans." 15 U.S.C. § 634(b)(6), (7).

Under the terms of the Act, SBA financial assistance to a small business under section 7(a) may take the form of a direct loan, an immediate participation (joint) loan with a lender, or a deferred participation (guaranteed) loan initiated by a lender but a portion of which the SBA will purchase from the lender in the event of a borrower default. 13 C.F.R. § 120.2(a); *see Valley Nat'l Bank v. Abdnor*, 918 F.2d 128, 129 (10th Cir. 1990); *Cal. Pac. Bank v. SBA*, 557 F.2d 218, 219 (9th Cir. 1977). In practice, however, the SBA ordinarily guarantees loans made by private lenders rather than disbursing funds directly to borrowers, *see United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 (1979), thus "reduc[ing] risk for lenders … mak[ing] it easier for them to access capital," and thereby "mak[ing] it easier for small businesses to get loans." *See https://www.sba.gov/funding-programs/loans*.

Ordinarily, to qualify for an SBA general business loan an applicant must be an operating business organized for profit that is located in the United States, 13 C.F.R. § 120.100(a)-(c); meet the size standards for a "small" business set forth under the statute and SBA rules (usually stated in terms of number of employees, or average annual receipts), *see* 15 U.S.C. § 632(a)(2); 13 C.F.R. § 120.100(d); 13 C.F.R. Part 121; and demonstrate that the desired credit is not available elsewhere on reasonable terms, 15 U.S.C. § 632(h); 13 C.F.R. §§ 120.100(e), 120.101. In addition, an applicant must meet SBA standards of creditworthiness, *see* 13 C.F.R. § 120.150; for loans over

4

$25,000, meet the lender's collateral requirements for similar non-SBA guaranteed loans, SBA Standard Operating Procedure ("SOP") 50-10-5(K), *Lender & Dev. Co. Loan Programs*, Subp. B, Chap. V, § II(B)(3)(b), at 193; and pay an annual "guaranteed [loan] fee" to the SBA equal to 0.55 percent of the outstanding balance of the SBA's share of the loan, 15 U.S.C. § 636(a)(23). Holders of 20 percent or more ownership shares in the applicant must personally guarantee the loan. 13 C.F.R. § 120.160(a).

### Ineligible Business Types Under 13 C.F.R. § 120.110

Pursuant to the broad powers conferred on the Administrator by the Small Business Act to make rules and regulations and take other actions deemed necessary or desirable in making SBA loans to small-business concerns, 15 U.S.C. § 634(b)(6), (7), the SBA over time has determined as a matter of policy that SBA business loans should not be made available to certain types of businesses, such as, for example, non-profit businesses, other lenders, businesses in which the lender owns an equity interest, and businesses that have previously defaulted on federal or federally assisted loans resulting in a loss to the Government. The types of business concerns deemed ineligible for SBA section 7(a) loans (18 in all) are listed at 13 C.F.R. § 120.110, and include, as relevant here, "[b]usinesses which (1) [p]resent live performances of a prurient sexual nature; or (2) [d]erive . . . more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature." *Id.* § 120.110(p). Businesses covered by paragraph (2) of this provision are those that derive more than five percent of their gross revenue from such sales, depictions, or displays. SOP 50-10-5(K), Subp. B, Chap. II, § III(A)(15)(a)(ii) at 114.

The SBA first decided that businesses of a prurient sexual nature should be deemed ineligible for SBA general business loans almost a quarter century ago, in January 1996, *see* 61

Fed. Reg. 3226-01 (Jan. 31, 1996)(final rule); 60 Fed. Reg. 64356, 64360 (Dec. 15, 1995)(proposed rule). It did so in accordance with its mandate under the Small Business Act to establish general policies that direct its limited financial resources in ways that will best serve the public interest. 60 Fed. Reg. at 64360 (citing 5 U.S.C. § 633(d)). So far as Defendants are aware, the validity of the SBA's policy concerning businesses of a prurient sexual nature, as codified in section 120.110(p), has never before been questioned in federal court.

**The Coronavirus Aid, Relief, and Economic Stimulus (CARES) Act**

On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and Economic Stimulus ("CARES") Act, Pub. L. 116-136, 134 Stat. 281, passed by Congress to provide an unprecedented package of emergency economic assistance and other support to help individuals, families, businesses, and health-care providers cope with the enormous economic and public health crises—unlike any experienced in the lifetime of the Nation—triggered by the worldwide coronavirus (COVID-19) pandemic. *See* SBA, Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck Protection Program*, 80 Fed. Reg. 20811-01, 20811-12 (Apr. 15, 2020)("PPP Interim Final Rule"); *see also, e.g.*, 166 Cong. Rec. H1732-01, 1820-24 (Mar. 27, 2020)(statements of Reps. Neal, Davis, and Mitchell); 166 Cong. Rec. S2059-01 (Mar. 25, 2020)(statement of Sen. Schumer); 166 Cong. Rec. S1862-02 (Mar. 20, 2020)(statement of Sen. McConnell). Among the numerous measures taken by the CARES Act to address the COVID-19 crisis, of principal concern here is the Paycheck Protection Program ("PPP"), CARES Act. § 1102, enacted to extend relief to small businesses experiencing economic hardship as a result of the public-health measures being taken to minimize the public's exposure to the COVID-19 virus. *See* PPP Interim Final Rule, 85 Fed. Reg. at 20811.

6

Specifically, section 1102(a)(2) of the CARES Act adds a new paragraph (36) to section 7(a) of the Small Business Act, 15 U.S.C. § 636(a)(36), which provides that "*[e]xcept as otherwise provided in this paragraph*, the [SBA] may guarantee [PPP] covered loans"—not make loans directly, however—"under the same terms, conditions, and processes as a loan made under this subsection," *i.e.*, section 7(a). 15 U.S.C. § 636(a)(36)(B)(emphasis added). The PPP then sets forth in extensive detail the precise ways in which PPP covered loans differ from other section 7(a) loans. *Id*. § 636(a)(36)(D)-(R). Among these differences, the PPP authorizes the SBA to make covered loans to various non-profit organizations, independent contractors, and self-employed individuals, as well as to small business concerns, *id*. § 636(a)(36)(D)(i), (ii); relaxes size limitations to allow businesses with as many as 500 employees (or more, depending on the industry in which they operate) to receive assistance, *id*. § 636(a)(36)(D)(i)(I); and selectively waives certain of the SBA's affiliation rules used to make small business "size" determinations, *id*. § 636(a)(36)(D)(iv); *see* 13 C.F.R. Part 121. The PPP also expressly caps the chargeable rate of interest of a covered loan at four percent (SBA has further limited the rate to one percent), *id*. § 636(a)(36)(L); PPP Interim Final Rule, 85 Fed. Reg. at 20813; and waives the "no credit elsewhere," personal guarantee, collateral, and guaranteed loan fee requirements imposed under section 7(a), SBA regulations, and SBA standard operating procedures. 15 U.S.C. § 636(a)(36)(h)-(J), (L). The PPP also requires that the SBA pay an origination fee to the lender that makes a covered loan equal to a specified percentage of the loan balance at the time of disbursement. *Id*. § 636(a)(36)(P).

The maximum amount of a PPP covered loan is the lesser of $10,000,000 or an amount calculated as a multiple of the applicant's total monthly "payroll costs," to which the balance of any outstanding disaster loans under 15 U.S.C. § 636(b)(2) may be added. *Id*. § 636(a)(36)(E);

§ 636(a)(36)(A)(viii)(I); *see* PPP Interim Final Rule, 85 Fed. Reg. at 20812-13. Section 1106 of

the CARES Act provides for forgiveness of up to the full principal amount borrowed. CARES

Act § 1106(b); PPP Interim Final Rule, 85 Fed. Reg. at 20811, 20813. The actual amount forgiven

will depend on a borrower's payroll costs and payments for rent, utilities, and mortgage interest.

CARES Act 1106(b)(1)-(4), (d); PPP Interim Final Rule, 85 Fed. Reg. at 20813. No later than 90

days after the date on which the amount of forgiveness is determined, the SBA must remit to the

lender the amount forgiven plus interest. CARES Act § 1106(c)(3).

Congress authorized the SBA to guarantee up to $349 billion-worth of loans to small

businesses under this new program. CARES Act § 1102(b)(1).

**Plaintiffs' Claims[2]**

Plaintiffs are four businesses that each own and operate a Silk Exotic Gentlemen's Club at

various locations in and around the city of Milwaukee, Wisconsin. (ECF No. 1, at ¶¶ 301-04.)

According to the Complaint, each of the Silk Exotic Gentlemen's Clubs "present[s] erotic

entertainment for its patrons." (*Id.* at ¶ 305.) These clubs have been closed since March 17, 2020,

as a result of orders issued by the Wisconsin Governor and Secretary of Health designed to combat

the coronavirus pandemic. (*Id.* at ¶ 407-08.) Plaintiffs contend that they have sought a PPP loan

from Associated Bank, but that Associated Bank has informed them via email, that due to 13

---

[2] On April 21, 2020, J.R. Schuster, LLC ("JRS"), which owns and operates "The Vegas Gentleman's Club" in Darien Wisconsin initiated a lawsuit also challenging the validity of 13 C.F.R. 120.110(p). In its motion for a preliminary injunction, JRS expressly refers to the *Camelot* action, which it characterizes as a "related case[.]" *See* 20-cv-634, ECF 3 (describing the Plaintiffs in this case as "similarly situated" to JRS and contending that "[t]he Vegas Club's constitutional rights are no less important than those of the plaintiffs in that case under an early identical set of facts."). Although cases 20-cv-601 and 20-cv-623 have not been consolidated, given JRS's acknowledgement of the substantial overlap between the legal issues raised in JRS and the legal issues in *Camelot* in connection with the arguments for preliminary injunctive relief, the Government is filing the same brief in both cases, as the parties agreed at the April 23, 2020, status conference in the JRS case.

C.F.R. § 120.110(p)'s prohibitions, the bank is unable to extend Plaintiffs any loans. (*Id.* ¶ 418.) Plaintiffs allege that due to the first-come, first-served nature of the PPP program, a delay in receiving a loan may preclude them from obtaining one at all. (*Id.* ¶¶ 424-25.) According to the Plaintiffs, without the proceeds from a PPP loan, Plaintiffs "may lack the staff and/or funds to reopen following the COVID-10 pandemic, resulting in the permanent ruination of their business [and] the inability of Plaintiffs to engage[ ] in protected First Amendment activity." (*Id.* ¶ 428.)

Based on these claims, Plaintiffs seek a preliminary injunction ordering the SBA "to immediately discontinue utilizing 13 C.F.R. § 120.110(p) and/or SBA SoB 50 10 5(K), Ch. 2(III)(A)(15) as criteria for determining PPP loan eligibility." (*Id.* ¶ 802.) That request should be denied.

## ARGUMENT

## I.   LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right," *Munaf v. Geren,* 553 U.S. 674, 689-90 (2008)(citation omitted), and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction "must establish that it has some likelihood of success on the merits; that it has no adequate remedy at law; and that without relief it will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield,* 922 F.3d 357, 364 (7th Cir. 2019)(internal quotation omitted). If the plaintiff fails to show a likelihood of success on the merits or otherwise fails to meet these threshold requirements, the court must deny the requested injunction. *See id.; Valencia v. City of Springfield,* 883 F.3d 959, 966 (7th Cir. 2018)("If it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms.").

9

If the plaintiff satisfies these threshold requirements, "the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *GEFT Outdoors,* 922 F.3d at 364. (internal quotation omitted). These two factors "merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009). The Seventh Circuit "employs a sliding scale approach for this balancing . . . the less likely a plaintiff is to win the more [the balance of harms] would need to weigh in its favor." *GEFT Outdoors,* 922 F.3d at 364 (internal quotation omitted).

For the reasons that follow, Plaintiffs have not satisfied the threshold requirements for preliminary injunctive relief because they have no likelihood of success on the merits and have not shown that they will suffer irreparable harm absent preliminary injunctive relief. Thus, it is unnecessary for this Court to reach the issue of whether the balance of harms favors Plaintiff or whether an injunction favors of the public interest. However, even if this Court were to reach these factors, they also weigh against issuing preliminary injunctive relief.

## II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

It is a fundamental tenet of the Supreme Court's constitutional jurisprudence that "although the government may not place obstacles in the path of a person's exercise" of constitutional freedoms, including "freedom of speech, it need not remove those not of its own creation." *Regan v. Taxation With Representation of Wash.,* 461 U.S. 540, 5449-50 (1983)(internal citations and alterations omitted). The Government does not restrict or penalize speech simply because it "has chosen not to pay for [it]." *Id.* at 546 (citing *Cammarano v. United States,* 358 U.S. 498, 513 (1959)). *See also Ysursa v. Pocatello Educ. Ass'n,* 555 U.S. 353, 358 (2009)(explaining that government "is not required to assist others in funding the expression of particular ideas.").

10

This bedrock principle ends this case. Plaintiffs do not cite a single precedent in which the Government was required to fund or subsidize speech on particular topics that the Government did not wish to promote—indeed, they fail to cite a single case concerning a government funding or subsidy program. Yet that is exactly what Plaintiffs ask of the Court here. No argument advanced or precedent cited by Plaintiffs supports that result.

**A.      Section 120.110(p) Is Not a Content-Based Restriction on Speech.**

Plaintiffs first contend that section 120.110(p) must be invalidated as a "content-based restriction[ ] on speech." Pls.' Mem. at 13-16. This claim suffers from numerous fatal defects and has no likelihood of success.

In the first place, section 120.110(p) is not a prohibition or restriction on speech. It simply embodies the SBA's policy that the agency will not use federal funds to subsidize businesses of a prurient sexual nature. *See AAPC*, 2020 WL 1935525, at *5 (holding that an analogous rule prohibiting SBA financing for businesses engaged in political activities or lobbying "is not a prohibition or restriction on speech"). As explained above, the Supreme Court has held time and again that the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See Regan*, 461 U.S. at 546; *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003); *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Hence, Plaintiffs' reliance on such cases as *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)(invalidating content-based restriction on posting of signs without a permit) and *Citizens United v. FEC*, 558 U.S. 310, 339 (2010)(striking down prohibition on corporate expenditures for political communications during election campaigns) as the touchstones of their analysis, *see* Pls.' Mem. at 13, is categorically misplaced.

The controlling principle here, articulated many times by the Supreme Court, is that the "government can make content-based distinctions when it subsidizes speech" as opposed to

regulating speech. *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188-89 (2007). It has "broad discretion," in fact, "to make content-based judgments in deciding what private speech to make available to the public." *Am. Library Ass'n*, 539 U.S. at 204-05; *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S.569, 587-88 (1998)("[I]n the subsidy context," the Government may allocate funding "according to criteria that would be impermissible were direct regulation of speech . . . at stake[.]"). Even though content-based, the Government's funding choices will be upheld unless they are shown to be "the product of invidious viewpoint discrimination," or "aim[ed] at the suppression of dangerous ideas." *Id.* at 586-87; *Regan*, 461 U.S. at 543-49 ("The case would be different if Congress were to discriminate invidiously in its subsidies" with an "inten[t] to suppress any ideas."); *see also Leathers v. Medlock,* 499 U.S. 439, 447, 450-51 (1991)(explaining that "differential taxation of First Amendment speakers is constitutionally suspect [only] when it threatens to suppress the expression of particular ideas or viewpoints").

Section 120.110(p) is not subject to invalidation under these standards. The SBA's policy that it will not subsidize loans to businesses of a prurient sexual nature is entirely viewpoint-neutral, and singles out no particular ideas for disfavorable treatment. The regulation prohibits federally subsidized loans to these businesses regardless of any ideas that they may wish to convey, promote, or oppose through the performances, depictions or displays they present or the products or services they sell. *See AAPC*, 2020 WL 1935525, at *5 (SBA policy against loans to political consultants and lobbyists is viewpoint-neutral and does not suppress certain ideas or beliefs).

In Plaintiffs' view the SBA's policy regarding businesses of a prurient sexual nature exhibits "clear disagreement" with Plaintiffs' "message", Pls.' Mem. at 14, but they are mistaken. Numerous messages and ideas can be conveyed through any given medium of expression, including depictions, displays and performances of a prurient sexual nature. Regardless of the

message conveyed, be it Plaintiffs' message (whatever that may be) or another, section 120.110(p) even-handedly provides that the SBA will not fund it.

It would not matter to the analysis, however, even if section 120.110(p) were taken as an expression of disagreement with Plaintiffs' unstated message. In *Rust*, private clinics that received federal funding to provide family-planning services objected to Government regulations that prohibited the use of those federal funds to counsel patients about abortion as a family-planning method. 500 U.S. at 179-80. The grantees contended that the regulations impermissibly discriminated on the basis of viewpoint, because they prohibited all discussion about abortion as a lawful family-planning option. *Id.* at 192. The Supreme Court disagreed, finding "no question but that [the] prohibition . . . was constitutional." *Id.* The Court explained that even where protected activity is implicated the Government, in exercising its authority to subsidize certain activities but not others, may make "value judgment[s]" and "implement [those] judgment[s] by the allocation of public funds." *Id.* at 192-93. "In so doing the Government [does] not discriminate[ ] on the basis of viewpoint; it . . . merely [chooses] to fund one activity to the exclusion of another." *Id.* at 193. That decision, "without more, cannot be equated with the imposition of a 'penalty'" or the "suppress[ion] [of] a dangerous idea." *Id.* at 193-94.

So too here. Even assuming, as do Plaintiffs, that section 120.110(p) embodies a "value judgment" about their "message," the mere decision that the SBA will not subsidize expression of that message is neither viewpoint discriminatory nor offensive to the First Amendment. *See AAPC*, 2020 WL 1935525, at *5. The rule must therefore be upheld.

**B.      Section 120.110(p) Need Not Conform to Constitutional Standards Governing Prohibitions of Obscenity.**

Because section 120.110(p) does not restrict or regulate speech, the test articulated in *Miller v. California,* 413 U.S. 15, 24 (1973) is irrelevant to the Court's resolution of Plaintiffs'

13

motion. "Obscene" material is not entitled to First Amendment protection.[3] *See, e.g., Ashcroft v. Am. Civil Liberties Union,* 535 U.S. 234, 240 (2002). As such, the regulation of obscenity triggers no judicial scrutiny. When a ban on obscenity is challenged on the grounds that it restricts or burdens protected speech, courts employ the *Miller* test to determine whether the regulation encompasses materials that are not obscene and thus protected by the First Amendment. *See id.* at 245-49.

The Government takes no position at this time regarding whether the performances offered by Plaintiffs is obscene, prurient—or, as Plaintiffs put it, "erotic, but not obscene[.]" Pls.' Mem. at 4. This inquiry and the associated *Miller* factors are not material to the issues presented in this case, which involves no regulation of speech, protected or otherwise. The only issue for the Court to resolve is whether the First Amendment requires the Government to subsidize Plaintiffs' speech. Contrary to the premise underlying Plaintiffs' Motion, the First Amendment includes no such requirement. *Leathers v. Medlock,* 499 U.S. at 450 (government "is not required to subsidize First Amendment rights[.]").

### C.  Section 120.110(p) Does Not Violate the Doctrine of Unconstitutional Conditions.

Plaintiffs next argue in passing that forcing them to "[a]bandon [their] chosen form of expression or forgo a government benefit" violates the doctrine of unconstitutional conditions. Pls.' Mem. at 21. This argument is meritless.

---

[3] Sexually-oriented entertainment that is not obscene falls within the "outer limits" of the First Amendment. *Ben's Bar, Inc. v. Vill. of Somerset,* 316 F.3d 702, 715 (7th Cir. 2003)(noting that "it is manifest that society's interest in protecting [erotic materials] is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate")(quoting *Young v. Am. Mini Theaters,* 427 U.S. 50, 70 (1976)); *City of Erie v. Pap's A.M.,* 529 U.S. 277 (2000)(explaining that "nude dancing of the type at issue here is expressive conduct, although we think that it falls only within the outer ambit of the First Amendment's protection").

14

SBA loan programs generally, and the PPP in particular, represent the exercise of Congress's power under the Spending Clause, U.S. Const. Art, I, § 8, cl. 1. These programs, and the considerable sums of taxpayer money that Congress appropriates to fund them, are a form of government subsidy that encourage third-party lenders to make funds available to small-business concerns that otherwise could not find credit on reasonable terms.[4] The Spending Clause gives Congress "broad discretion to tax and spend for the 'general Welfare,'" including the authority "to impose limits on the use of [the] funds" it appropriates for particular programs or activities, "to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds," even where the condition "may affect the recipient's exercise of its First Amendment rights." *Id.* at 214 (citing *Am. Library Ass'n*, 539 U.S. at 212). "At the same time, however, . . . the Government may not deny a benefit to a [party] on a basis that infringes [its] constitutionally protected freedom of speech[.]" *Id.*

The relevant distinction, the Court explained, is between conditions that merely "define the limits of [a] Government spending program" by "specify[ing] the activities the [Government] wants [or does not want] to subsidize"—which are permissible, *see Rust*, 500 U.S at 194—and

---

[4] The PPP is undeniably a subsidy. The PPP makes $349 billion available to small businesses nationwide to which they would not otherwise have ready access, if at all. The SBA's guarantee provides a powerful financial incentive to lenders to make these loans—loans they would not otherwise be willing to underwrite. In addition, although in theory the loans must be repaid, under the CARES Act and the SBA's interim rules, the interest rate on PPP loans is capped at one percent, collateral is not required, guarantee fees are waived, and perhaps most critically, up to the full principal amount of a loan may qualify for forgiveness, as explained above. Thus the Act makes these loans far less expensive to small-business borrowers than market-rate loans would be. Moreover, these savings for borrowers come at significant, and potentially enormous, cost to taxpayers. The SBA subsidizes every PPP loan by paying an origination fee to the lender, and may have to pay billions of additional dollars to lenders to reimburse them for forgiven loans, and to make good on SBA's guarantees in the event of borrower defaults. *See AAPC*, 2020 WL 1935525, at *3-4 (concluding that PPP loans are the legal and practical equivalent of subsidies).

15

conditions that "leverage[ ] federal funding to regulate [recipients'] speech outside the scope of the program"—which are not.  *All. for Open Soc'y*, 570 U.S. at 214-17.  *See also Rust*, 500 U.S. at 197.

To illustrate the difference both *Alliance for Open Society*, 570 U.S. at 215, and *Rust*, 500 U.S. at 197-98, pointed to *Regan*.  There the IRS had denied tax-exempt status to the plaintiff, a non-profit organization, because its intended use of tax-deductible contributions to support its lobbying activities was prohibited by section 501(c)(3) of the Internal Revenue Code.  *Regan*, 461 U.S. at 542.  The plaintiff challenged this prohibition as an unconstitutional condition imposed on its receipt of tax-deductible contributions from donors.  *Id.* at 545.  The Court had no difficulty rejecting this claim.  *See id.* at 545-46.  Treating the tax-deductibility of contributions as "similar to cash grants" to the organization, the Court concluded that the plaintiff could continue to receive tax-deductible contributions for its non-lobbying activities by forming an affiliated tax-exempt entity, under section 501(c)(4) of the Code, that would be permitted to conduct lobbying activities using sources of funds other than tax-deductible (that is, federally subsidized) contributions.  *Id.* at 544-46.  Thus, the plaintiff was not prohibited from using non-subsidized contributions to engage in lobbying, nor denied other government benefits because of its intent to lobby; "Congress ha[d] merely refused to pay for the lobbying out of public monies."  *Id.* at 545.

In reaching this conclusion, *Regan* distinguished the precedent on which Plaintiffs rely, *Perry v. Sinderman*, 408 U.S. 593 (1972).  *See* 461 U.S. at 545; Pls.' Mem. at 21.  In *Perry* the Court concluded that an untenured professor at a state college could not be terminated based on his constitutionally protected expression, holding that government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests[.]" 408 U.S. at 597-98.  The petitioner in *Regan* relied on *Perry* to challenge the constitutionality of the tax deduction at issue;

16

the Court rejected the comparison explaining that "mere[ ] refus[al]" to pay for the expression of a private party "out of public monies" does not "fit[ ] the [*Perry*] model." 461 U.S. at 545. Government does "not infringe[ ] any First Amendment rights" within the meaning of *Perry* when it "simply [chooses] not to pay for" that private party's speech. *Id.* at 546.

That is the situation here. Section 120.110(p) does not prohibit businesses of a prurient sexual nature from expressing themselves using their own funds; nor does it deny them benefits "independent [of the PPP] on account of [their] intention" to engage in expressive activities; it has "merely refused to pay for [these activities] out of [PPP] monies." *Id.* That decision is perfectly constitutional.

That conclusion is reinforced by *American Library Association*, *supra.* In that action the plaintiffs challenged a federal law that required public libraries receiving federal financial assistance for the purpose of providing Internet access to install filtering software designed to block access to online pornography. *See* 539 U.S. at 198-99. The plurality rejected the contention that Congress had imposed an unconstitutional condition on the libraries' receipt of this federal assistance. *Id.* at 210-12. Congress had not "penalize[d]" libraries that chose not to install filters by denying them other, unrelated federal benefits, and the libraries remained free to offer unfiltered Internet access to their patrons using their own funds, without the benefit of federal aid. *Id.* at 212. Congress had simply decided not to subsidize unfiltered Internet access.

Likewise, under section 120.110(p), no small business is denied benefits outside the parameters of the PPP simply because it engages in pruriently sexual activities; businesses that wish to conduct these activities are free to do so using their own funds rather than Government-subsidized loans. What they cannot do is have it both ways, as Plaintiffs insist. They are not entitled to federal subsidies *and* to use those subsidies to finance activities, even expressive

17

activities, that the Government does not wish to fund, any more than public libraries were entitled both to receive federal subsidies *and* to use those subsidies for unfiltered Internet access that the Government did not wish to pay for.

### D. Section 120.110(p) Does Not Impose A Prior Restraint on Speech.

Plaintiffs' reliance on the "prior restraint" doctrine is also mistaken. Pls.' Mem. at 21-23. The "term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993)(citation omitted). But in administering the PPP, SBA "does not *forbid*" Plaintiffs from "engag[ing] in any expressive activities in the future, not does [SBA] require [Plaintiffs] to obtain prior approval for any expressive activities." *Id.* at 550-51. The Plaintiffs' performers may "dance [as] provocatively" as Plaintiffs would like tomorrow, "without any risk" that SBA would "impose[]" a "legal impediment to . . . Plaintiffs' ability to engage in any expressive activity [they] choose[]." *Id.* at 551. Rather, all that section 120.110(p) provides is that Plaintiffs "cannot finance [their] enterprises" with SBA loans, which may be a practical challenge because of the COVID-19 pandemic and the emergency measures taken in response to it, but which certainly is not a "legal impediment" set up by statute or regulation, of the sort in question in the licensing cases on which Plaintiffs rely. *Compare id.* at 549-51, *with, e.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223-24 (1990)(describing municipality's licensing scheme for "sexually oriented businesses"). Put another way, SBA's decision not to add loans to Plaintiffs to its portfolio of guarantees is a portfolio-management decision, "not a restraint on private speech." *See Am. Library Ass'n*, 539 U.S. at 209 n.4 (rejecting a dissenting Justice's "prior restraint" theory because a "library's decision to use filtering software is a collection decision, not a restraint on private speech . . . . a public library does not have an

obligation to add material to its collection simply because the material is constitutionally protected.").

### E. Section 120.110(p) Is Not Void-For-Vagueness.

Plaintiffs next contend that section 120.110(p) is unenforceable because it is impermissibly vague. Pls.' Mem. at 24. But this argument is unavailing. The vagueness doctrine arose in the criminal context, and while it may apply to certain civil matters, the standard for vagueness in the civil context is far less stringent. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982). Section 120.110(p) easily passes muster under the limited vagueness standard applicable to provisions establishing government funding programs.

In *Finley*, the Supreme Court flatly rejected a vagueness argument in the context of a program that required the National Endowment of the Arts to consider "decency and respect" as factors in selecting which applicants would receive government funding. 524 US at 589-90. The Court explained that the provisions at issue were "undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* Yet, in the context of a grant program, those concerns were absent. The Court explained that it "is unlikely . . . that speakers will be compelled to steer too far clear of any 'forbidden area' in the context of grants of this nature." *Id.* The Court further noted that where the Government is subsidizing activity, perfect clarity is not always "feasible." *Id.* For example, Government programs sometimes award scholarships or other subsidies on the basis of standards as vague as "excellence." *Id.* (citing 2 U.S.C. § 802). Applying the full vagueness framework to such subsidy cases would "call into question the constitutionality of [many] valuable Government programs." *Id.* Accordingly, the Court upheld the challenged provision.

19

*Finley* controls Plaintiffs' vagueness challenge. Like the arts program at issue in *Finley*, the PPP is a subsidy program aimed at providing government funds to certain businesses, and therefore section 120.110(p) is subject only to the limited vagueness review articulated in *Finley*. And like the requirement that the NEA consider whether art displays "decency and respect," the limitation on lending to "[b]usinesses which . . . [p]resent live performances of a prurient sexual nature" is sufficiently precise to survive the limited vagueness analysis applied to public grant programs. This provision is not nearly as open ended as Plaintiffs suggest. The phrase "prurient sexual nature" provides sufficient clarity for the grant program at issue. As the regulatory history makes clear, the Administrator promulgated this regulation to respond to "inquiries regarding businesses engaged in activities which . . . may be considered by the average person to be obscene or pornographic" such as "nude dancing." 60 Fed. Reg. at 64360. Under *Finley*, this regulation is sufficiently precise.

And while Plaintiffs' challenge to section 120.110(p) arises in the context of the PPP program, it is important to recall that the provision is nearly a quarter-century old and has governed other SBA loan programs for its entire life. As Plaintiffs themselves make clear, the limitations section 120.110(p) imposes on the SBA's loan programs has not caused them "to steer too far clear of any 'forbidden area'"; on the contrary, they have utilized their own sources of funding to create a business that does not qualify for taxpayer assistance—precisely as contemplated by the relevant regulations. *See* 60 Fed. Reg. at 64360 (noting that a business that does not qualify for an SBA loan "may still express their views, exercise their freedoms, operate their businesses, and obtain any other aid available to them").

Plaintiffs do not acknowledge the limitations on the vagueness doctrine in the context of a government subsidy. Instead, they ignore *Finley* and instead cite cases interpreting statutes that

20

either impose criminal penalties or directly regulate speech. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)(invalidating under the Due Process clause a law that imposed a criminal penalty on "loitering"); *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997)(invalidating a criminal provision of the Communications Decency Act as vague); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)(invalidating as vague a law permitting arrest where an individual cannot provide a "credible and reliable" identification on demand by law enforcement); *Entertainment Concepts, Inc., III v. Maciejewski*, 631 F.2d 497, 501 (7th Cir. 1980)(striking down a vague ordinance that prevented the display of movies at a theater). But as *Finley* readily acknowledges, such circumstances tolerate far less vagueness than the government funding context. Because the PPP program neither imposes a penalty nor directly regulates any speech, and the cases Plaintiffs cite do not control here. Section 120.110(p) is not impermissibly vague.

### F. Section 120.110(p) Easily Satisfies Equal Protection Requirements.

Plaintiffs contend that section 120.110(p) violates Equal Protection requirements imposed on the Federal Government by the Fifth Amendment because the rule distinguishes between small businesses that can receive PPP covered loans, and those, like Plaintiffs, who are ineligible for loans because they offer live performances of a prurient sexual nature. *See* Pls.' Mem. at 27-28. This argument is foreclosed by *Regan,* and *Ysursa.*

In *Regan,* the plaintiff, in addition to raising a First Amendment challenge, also "contend[ed] that the equal protection component of the Fifth Amendment render[ed] the [section 501(c)(3)] prohibition against substantial lobbying invalid." 461 U.S. at 546. The Supreme Court held otherwise. *Id.* at 547-51. First, it rejected the conclusion that strict scrutiny of the law was required simply because it "*affect[ed]* First Amendment rights on a discriminatory basis", and instead applied rational basis review under the Fifth Amendment. *Id.* The lobbying restriction

easily withstood review under this standard, for it was "not irrational" for Congress to decide that that the public interest in promoting additional lobbying by charities would not be worth the taxpayer expense. *Id.* at 550. *See also Ysursa,* 555 U.S. at 359-60 ("Given that the State has not infringed the unions' First Amendment rights" by refusing to make public employee payroll deductions for union political activities, "the State need only demonstrate a rational basis to justify [its decision].").

Section 120.110(p) must be upheld on the same grounds. Because the rule restricts only the use of federal funds (not a firm's own monies) to engage in a business offering live performances of a prurient sexual nature, it need only withstand rational-basis review under the Fifth Amendment. It clearly meets that test. If it was "not irrational" of the Government in *Regan* to decide it would not be worth the expense to taxpayers of subsidizing lobbying, speech that lies "at the core of First Amendment protections[,]" *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016), then it was also not irrational of the SBA to decide that it would not be worth the commitment of its finite resources to subsidize additional speech of a prurient sexual nature, which lies at "the outer perimeters of the First Amendment," *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66 (1991) (plurality opinion). Thus, Plaintiffs' Equal protection claim, like their other claims, exhibits no prospect of success on the merits.

### G.      Section 110.120(p) Does Not Infringe Plaintiffs' "Occupational Liberty."

Plaintiffs' "occupational liberty" argument also lacks merit. Whatever the law may have been in 1897, see Pls.' Mem. at 28 (citing *Allgeyer v. St. of La.*, 165 U.S. 578 (1897)), "there is no such cause of action [for deprivation of occupational liberty] under substantive due process." *Zorzi v. County of Putnam,* 30 F.3d 885, 895 (7th Cir. 1994)(citing *Illinois Psychological Ass'n v. Falk,* 818 F.2d 1337, 1343-44 (7th Cir. 1987)). And even if the Supreme Court's contemporary

22

jurisprudence of substantive due process still recognized a right of occupational liberty, it would also still be the case that a "decision not to subsidize the exercise" of such a right would "not infringe the right." *Rust*, 500 U.S. at 193.

## H.     The CARES Act Authorizes SBA To Follow Section 120.110(p) In Making PPP Loans.

Finally, Plaintiffs contend that section 120.110(p) is unenforceable because the CARES Act does not authorize "the adoption of regulations limiting which businesses are eligible for PPP loans." Pls.' Mem. at 28.  But this argument is based on "isolated provisions" of the relevant statute, not its whole text, which plainly allows the SBA to apply the regulation. *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U. S. 280, 290 (2010).

Section 1102(a)(2) of the CARES Act adds a new paragraph (36) to section 7(a) of the Small Business Act, 15 U.S.C. § 636(a)(36), stating: "*[e]xcept as otherwise provided in this paragraph*, the [SBA] may guarantee [PPP] covered loans"—not make loans directly, however— "under the *same terms, conditions, and processes* as a loan made under this subsection," *i.e.*, section 7(a). *Id.* § 636(a)(36)(B)(emphases added).  Then the CARES Act details how PPP covered loans differ from other section 7(a) loans. *Id.* § 636(a)(36)(D)-(R).  For example, among these differences, the PPP authorizes the SBA to make covered loans to various non-profit organizations, independent contractors, and self-employed individuals, as well as to small business concerns, *id.* § 636(a)(36)(D)(i), (ii); and relaxes size limitations to allow businesses with as many as 500 employees (or more, depending on industry) to receive assistance, *id.* § 636(a)(36)(D)(i)(I).  In other words, where Congress wished to alter the SBA's existing rules and regulations, it did so expressly.  But the statute provides no written exception regarding section 120.110(p).  So, because the statute allows only those exceptions that are "provided in" the text, § 636(a)(36)(B), there is no ground for inferring an exception.

23

Plaintiffs' contention that an exception should be inferred to benefit them not only ignores the plain statutory language, but also violates basic principles of interpretation. When Congress enacts a provision explicitly defining the reach of a statute, it implies that matters not specifically defined are not within the statute's reach. *See, e.g.*, *Cipollone v. Liggett Group, Inc*., 505 U.S. 504, 517 (1992); *In re Cash Currency Exchange, Inc.*, 762 F.2d 542, 552 (7th Cir. 1985).

## I.     The Small Business Act Provides That "No Injunction" Shall Issue Against SBA.

In addition to the fatal shortcomings of Plaintiffs' constitutional claims, Plaintiffs are also unlikely to succeed on the merits because Congress has restricted the availability of injunctive relief against the SBA. Specifically, the Small Business Act provides that the SBA may:

> sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy, *but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [agency] or [its] property[.]*

15 U.S.C. § 634(b)(1)(emphasis added). Many courts have interpreted this statute to preclude injunctive or any similar relief against the SBA. *See, e.g., Little v. United States,* 489 F. Supp. 1012, 1016 (C.D. Ill. 1980)(noting that "Plaintiff has withdrawn his claim for injunctive relief in light of the express prohibition of such relief in the Small Business Act. While this provision precludes injunctive relief, it does waive sovereign immunity with respect to other types of relief."); *see also, e.g., Keita  v. U.S. Small Business Admin.,* No. 07-CV-4958 (ENV)(LB), 2010 WL 395980, at *4 (E.D.N.Y. Feb. 3, 2010)(noting that courts have interpreted 15 U.S.C. § 634(b) to "preclude [] injunctive or any similar relief against the SBA itself" and concluding that "[s]ince [plaintiff] seeks only injunctive relief, the Small Business Act expressly denies the Court subject matter jurisdiction to review the SBA loan denial decisions."); *Enplanar, Inc. v. Marsh,* 11 F.3d 1284, 1290 (5th Cir. 1994); *Driskill, Inc. v. Abdnor,* 901 F.2d 383, 386 (4th Cir. 1990)(explaining

24

that "courts have no jurisdiction to award injunctive relief against the SBA"). Other courts have adopted a narrower view of § 634(b)'s apparent bar on injunctions against the SBA. *See, e.g, Ulstein Mar., Ltd. v. United States,* 833 F.2d 1052, 1056-17 (1st Cir. 1987)(interpreting 15 U.S.C. § 634(b) to not necessarily bar injunctions against the SBA in all circumstances.

Because Plaintiffs have not demonstrated a likelihood of success on the merits, they are not entitled to injunctive relief against any of the Defendants, regardless of whether such relief is available against the SBA under 15 U.S.C. § 634(b. Thus, it is not necessary for the Court to resolve questions concerning the statute's reach at this time. Nevertheless, this provision casts still further doubt, if any were needed, on the likelihood of Plaintiffs' success in this case.

## III. PLAINTIFFS HAVE NOT ADDUCED SUFFICIENT EVIDENCE OF IRREPARABLE HARM.

In a preliminary injunction proceeding, it is Plaintiffs burden to set forth specific facts supporting their alleged injury; Plaintiffs may not simply "replace conclusory allegations of [a] complaint . . . with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Plaintiffs have not carried their burden here.

As in other cases where courts have denied preliminary injunctive relief, Plaintiff's allegations of irreparable harm are "conclusory and unsupported." *Sieren v. William R. Hague, Inc.,* 999 F. Supp. 1244 (E.D. Wis. 1998)(plaintiff had not shown irreparable harm where their "allegation of irreparable harm [was] conclusory and unsupported"). Plaintiffs assert that "[w]ithout issuance of an injunction, Plaintiffs risk the ruination of their business because the PPP funds provided by the Act are to be issued on a 'first-come, first served' basis[.]" Pls.' Mem. at 31. On this point, Plaintiffs allege in their complaint that without the proceeds from a PPP loan, Plaintiffs "*may* lack the staff and/or funds to reopen following the COVID-10 pandemic, resulting in the permanent ruination of their business [and] the inability of Plaintiffs to engage[] in protected

First Amendment activity." (EDWI 20-cv-601, ECF No. 1, ¶ 428.)(Emphasis added). However, none of the declarations that Plaintiffs submit with their motion provide any specific facts concerning financial or other harm Plaintiffs anticipate that they will suffer. Plaintiffs offer no detail concerning their current financial circumstances, available assets, or their efforts to obtain alternative sources of financing.[5] Even accepting Plaintiffs' claims concerning the availability of PPP at face value, Plaintiffs have not made any particularized showing as to their own businesses' financial circumstances or why they will suffer irreparable harm if they are not eligible for loans. At best, Plaintiffs have shown a speculative, "possible" injury, which is not enough to demonstrate an entitlement to preliminary injunctive relief. *Winter,* 555 U.S. at 22; *GEFT Outdoors, 922* F.3d at 364.

## IV.   A PRELIMINARY INJUNCTION WOULD BE CONTRARY TO THE PUBLIC INTEREST.

Finally, to obtain preliminary injunctive relief in a case against the Government, Plaintiffs must show than an injunction prohibiting application of section 120.110(p) under the PPP would be in the public interest. *Nken,* 556 U.S. at 435. Plaintiffs cannot make this showing, because Congress has already determined that the SBA should continue to apply the restrictions on eligibility codified under section 120.110 when administering the PPP.

As discussed above, when Congress passed the CARES Act, it decided that PPP covered loans should be made under the same terms and conditions as other SBA section 7(a) loans, "[e]xcept as otherwise provided" in the PPP. 15 U.S.C. § 636(a)(36)(B). The PPP sets forth in careful detail which provisions of section 7(a), and the SBA's implementing regulations, are

---

[5] The declaration that the *Camelot* Plaintiffs filed on April 24, 2020 does not affect this analysis because like their initial filing it contains no details concerning the financial resources currently available to Plaintiffs, among other deficiencies. (*See* Case No. 20-cv-601, ECF 24.)

waived or modified for purposes of making PPP covered loans.  *Id.* § 636(a)(36)(D)-(R).  Section 120.110(p) is not among them.

Plaintiffs offer no justification for disturbing that legislative judgment.  Plaintiffs assert that their employees are "members of the public" and that receiving the loans will help to "stabilize the local and national economy," but these general assertions only underscore that Plaintiffs are playing a zero-sum game.  Pls.' Mem. at 33.  Where the demand for PPP covered loans exceeds the available funds, PPP financing allocated to Plaintiffs necessarily would come at the cost of denying it to others seeking the same assistance.  The fact that Plaintiffs are engaged in expressive activities does not entitle them to overturn Congress's funding choices, or to receive government largesse at the expense of others—waiters, waitresses, hotel workers, retail staff, and the like— who are just as much in need of the Government's economic assistance in this time of crises as are Plaintiffs if not more so.

## V.    IF THIS COURT ISSUES A PRELIMINARY INJUNCTION, IT SHOULD REQUIRE PLAINTIFFS TO POST A BOND.

If this Court determines that a preliminary injunction is warranted—which it is not—the injunction should only require the SBA to continue to reserve guarantee authority.  This Court should not require SBA to transmit loan authorization numbers to Plaintiffs' lending institutions, resulting in disbursement of the loan proceeds, at the preliminary injunction stage.

If this Court grants Plaintiffs' request for preliminary injunctive relief that results in the disbursement of a PPP loan guaranteed by the SBA, it should require Plaintiffs to post a bond.  Fed. R. Civ. P. 65(c).  There is no question that the SBA would suffer harm if, after the issuance of such an order, it ultimately prevailed on the merits and this Court determined that Plaintiffs are ineligible for a PPP loan.  *See Roche Diagnostics Corp. v. Med. Automation Sys., Inc.,* 646 F.3d 424 (7th Cir. 2011)("A party injured by an erroneous preliminary injunction is entitled to be made

whole."). Each Plaintiff should post a bond equal to the full amount of their respective SBA-guaranteed loans, which is the amount that would cover SBA's losses from an erroneous injunction. *Roche,* 646 F.3d at 424 ("Judges therefore should take care that the bond is set high enough to cover the losses that their handiwork could cause. A limit of zero—the upshot of an injunction without a bond—is bound to be too low."); *Mead Johnson & Co. v. Abbot Labs.,* 201 F.3d 883 (7th Cir. 2000)("When setting the amount of security, district courts should err on the high side.")

None of the cases that Plaintiffs cite in support of their position that no bond should be required stands for the proposition that cases involving constitutional issues are exempt from Rule 65's bond requirement. If anything, those cases support the Government's position that a bond should be required. For example, Plaintiffs cite a pair of cases—*Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers,* 679 F.2d 978 (1st Cir. 1982)(*rev'd* 467 U.S. 526) and *Diaz v. Brewer,* 656 F.3d 1008 (9th Cir. 2011)—where courts declined to require a bond in cases brought by individual plaintiffs, rather than businesses. *See* Pls.' Mem. at 33. In *Crowley,* where the plaintiff was indigent, the Court explained that "[a]pplicants in commercial cases—merchants, manufacturers, and others—can be assumed capable of bearing most bond requirements, so hardship to them is less of a factor." *Id.* at 1000. Given that Plaintiffs are commercial entities applying for business loans, these cases actually underscore that requiring a bond is appropriate in this case. And in *Moore v. Johnson,* No. 14-11903, 2014 WL 4924409, at *9 (E.D. Mich. May 23, 2014), the court noted that "[n]o party here has sought a security bond[.]" Here, in contrast, the Government is requesting a bond and has demonstrated that it will be harmed if a preliminary injunction is issued.

For these reasons, if this Court issues a preliminary injunction that requires Plaintiffs' SBA-guaranteed loans to be disbursed to Plaintiffs, it should require Plaintiffs to post bonds in an amount equal to the full amount of the SBA's guarantees.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction should be denied.

MATTHEW D. KRUEGER
United States Attorney


By:      s/Carter B. Stewart

EMILY CONSTANTINE
CARTER B. STEWART
Assistant United States Attorney
Attorneys for Defendants
Wisconsin State Bar # 1087257
Wisconsin State Bar # 1117543
530 Federal Courthouse
517 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202
Phone: (414) 297-1700
Fax:    (414) 297-4394
emily.constantine@usdoj.gov
carter.stewart@usdoj.gov

29