# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**CAMELOT BANQUET ROOMS, INC.,**
**DOWNTOWN JUNEAU INVESTMENTS, LLC,**
**MIDRAD, LLC, and**
**PPH PROPRTIES I, LLC**
                        **Plaintiffs,**

            **v.**                                      **Case No. 20-C-0601**

**UNITED STATES SMALL BUSINESS**
**ADMINISTRATION; JOVITA CARRANZA,**
**in her Official Capacity as Administrator of**
**the Small Business Administration;**
**UNITED STATES OF AMERICA; and**
**STEVEN MNUCHIN, in his Official Capacity**
**as United State Secretary of Treasury,**
                        **Defendants.**

---

**J.R. SCHUSTER, LLC,**
                **Plaintiff,**

**v.**                                            **Case No. 20-C-634**

**UNITED STATES SMALL BUSINESS**
**ADMINISTRATION; JOVITA CARRANZA,**
**in her Official Capacity as Administrator of**
**the Small Business Administration;**
**UNITED STATES OF AMERICA; and**
**STEVEN MNUCHIN, in his Official Capacity**
**as United State Secretary of Treasury,**
                        **Defendants.**

---

## DECISION AND ORDER

Each of the plaintiffs in these cases runs a nightclub in Wisconsin that features

nude and/or semi-nude erotic dance entertainment, which are forms of expression

protected by the Free Speech Clause of the First Amendment. *See, e.g., Schad v.*

*Borough of Mount Ephraim*, 452 U.S. 61, 66 (1981). Because of the COVID-19 pandemic and the "safer at home" order issued by Wisconsin officials, each nightclub is closed and will remain closed for weeks, maybe months. On March 27, 2020, the United States enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). Among its provisions is a program known as the Paycheck Protection Program ("PPP"), which authorizes the U.S. Small Business Administration ("SBA") to guarantee loans to small businesses to help them pay employees during the economic crisis caused by the response to the pandemic. *Id.* § 702 Each plaintiff applied for a loan through this program. However, each plaintiff's bank, in conjunction with the SBA, determined that they were not eligible for relief through the PPP. This decision was based on a regulation enacted by the SBA in 1996, under which small businesses that "[p]resent live performances of a prurient sexual nature" are not eligible to participate in any SBA business loan program. *See* 13 C.F.R. § 120.110(p).

The plaintiffs promptly commenced these actions against the United States, Treasury Secretary Steven Mnuchin, the SBA, and SBA Administrator Jovita Carranza, and filed motions for a temporary restraining order and preliminary injunction. They allege that the SBA regulation, as applied to them through the PPP, violates their rights under the Free Speech Clause of the First Amendment and the equal-protection component of the Fifth Amendment's Due Process Clause. Because PPP funds are limited and distributed on a first-come, first-served basis, the plaintiffs requested temporary restraining orders to preserve their spots in the application queue. I held a telephonic proceeding on that request, at which the defendants appeared through counsel, and then granted the request. Pursuant to the restraining orders, the defendants set aside enough

reserve authority to guarantee the PPP loans sought by the plaintiffs and prepared internal loan numbers that, if transmitted to the plaintiffs' bank, would allow the bank to complete the loans.

In this order, I address the plaintiffs' motions for a preliminary injunction, in which they seek to enjoin the defendants from continuing to use the SBA regulation to exclude them from the PPP.

## I. BACKGROUND

Each plaintiff in Case No. 20-C-0601 (the "Camelot" case) operates a nightclub in Wisconsin under the name Silk Exotic Gentlemen's Club. Three of the clubs are located in Milwaukee, and the fourth is located in Middleton. Each club is licensed by the municipality in which it operates to present erotic dance entertainment. The dancers at the clubs in Milwaukee wear a costume made of nontransparent material that covers the areola and nipple of the breasts, their pubic hair, and the cleavage of their buttocks, as is required by local ordinance. The dancers at the club in Middleton appear nude or semi-nude. The plaintiffs allege that all the entertainment they provide "is non-obscene (and not prurient), appeals to healthy human interests and desires, and is in full compliance with [local law]." Compl. ¶ 404.

The plaintiff in Case No. 20-C-634 (the "Schuster" case) operates "The Vegas Gentlemen's Club" in Darien, Wisconsin. It is licensed by the municipality to present erotic dance entertainment. The entertainment provided by The Vegas Club consists of semi-nude performers on a stage with a vertical pole that spins. The entertainers use the pole during their performances, which are colloquially referred to as "pole dancing." Compl. ¶ 41. The plaintiff alleges that all the entertainment it provides is non-obscene, appeals

to healthy human interests and desires, and is in compliance with the numerous licenses and permits that it holds which are annually reviewed by the Town of Darien.

In late March 2020, the State of Wisconsin began issuing orders in response to the coronavirus pandemic and the disease COVID-19. Under the orders, many businesses were required to close, and Wisconsin residents were ordered to remain at home unless they were engaged in essential activities. As a result of these orders, each of the plaintiffs' clubs has been closed for business since 5:00 p.m. on March 17, 2020. They will remain closed at least until the orders expire. As of this writing, the orders are set to expire on May 26, 2020. It is not certain that the plaintiffs will be allowed to reopen on May 26, 2020. And even if they are permitted by law to reopen at that time, they likely will be subject to restrictions designed to minimize the spread of COVID-19.

To address the economic impact of COVID-19, Congress passed the CARES Act. Title I of the Act is the "Keeping Workers Paid and Employed Act." Among the provisions of this title is the "Paycheck Protection Program," or PPP. *See* CARES Act § 702, 15 U.S.C. § 636(a)(36). The PPP is a new loan program to be administered by the SBA under Section 7(a) of the Small Business Act (codified at 15 U.S.C. § 636(a)). Its purpose is to assist small businesses during the COVID-19 crisis by immediately extending them loans on favorable terms. The loans are made by the SBA's participating banks and guaranteed by the SBA itself.  Section 1106 of the CARES Act provides that a borrower's indebtedness under a PPP loan will be forgiven to the extent that the borrower uses the funds to pay expenses relating to payroll, mortgage interest, rent, and utilities during the eight-week period following the loan's origination. CARES Act § 1106. If a borrower qualifies for loan forgiveness, the SBA must pay the lender an amount equal to the

amount forgiven, plus any interest accrued through the date of payment. *Id.* § 1106(c)(3). However, the SBA has determined that not more than 25% of the loan forgiveness amount may be attributable to non-payroll costs. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,813–14 (April 15, 2020).

The plaintiffs, like nearly all other businesses in the United States, have suffered significant losses because they cannot conduct business as usual. Thus, they applied for PPP loans through their banks. Each plaintiff's bank informed it that its application would be denied under an SBA regulation providing that businesses that "[p]resent live performances of a prurient sexual nature" are not eligible to participate in SBA loan programs. *See* 13 C.F.R. § 120.110(p). This regulation was not enacted in connection with the PPP. Instead, it is a regulation that the SBA issued in 1996 and that applies to all its business loan programs, including those under §7(a) of the Small Business Act— of which the PPP is now a part. *See* Business Loan Programs, 61 Fed. Reg. 3226, 3227 (Jan. 31, 1996).

Once the plaintiffs learned that their applications had been denied, they commenced these actions. They allege that the SBA regulation denying eligibility to businesses that present live performances of a prurient sexual nature is unconstitutional to the extent that it applies to non-obscene nude or semi-nude dancing, which is a form of expression protected by the Free Speech Clause of the First Amendment. Because the PPP is "first-come, first-served," *see* 85 Fed. Reg. at 20,813, and funding for the program was expected to be exhausted quickly, the plaintiffs immediately filed motions for a

5

temporary restraining order and preliminary injunction to preserve their ability to obtain PPP loans if they succeed on the merits of their claims.

As noted, I granted the plaintiffs' motions for a temporary restraining order, and the government has since reserved guarantee authority for the PPP loans the plaintiffs applied for. However, I allowed the government to instruct the plaintiffs' bank to refrain from funding the loans until I decided the plaintiffs' motions for a preliminary injunction. The parties have completed briefing on those motions, and I address them below.

## II. INJUNCTIVE RELIEF AGAINST THE SMALL BUSINESS ADMINISTRATION

Before turning to the traditional preliminary injunction factors, I first address the defendants' suggestion that injunctive relief is not available against the SBA. They point to the "sue and be sued" provision of the Small Business Act, which provides that the SBA Administrator may

> sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; *but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property*.

15 U.S.C. § 634(b)(1) (emphasis added).

Initially, I note that this provision applies only to the SBA and its Administrator, who are not the sole defendants. The plaintiffs have also sued the United States and Steven Mnuchin in his official capacity as Secretary of the Treasury. These defendants do not claim to be immune from injunctive relief; nor do they claim that they could not grant the plaintiffs access to the PPP unless the SBA were also enjoined. Moreover, the government has only half-heartedly asserted that the sue-and-be-sued provision blocks injunctive relief against the SBA and its Administrator. The government notes that various

6

lower courts have reached different conclusions on this issue, but it does not argue that the courts that have interpreted § 634(b)(1) to preclude all injunctive relief against the SBA are correct. Rather, the government only suggests that the split of authority on this issue "casts further doubt" on the plaintiffs' likelihood of success. Br. in Opp. at 25.

In any event, I conclude that § 634(b)(1) does not preclude injunctive relief against the SBA in a case such as this. Provisions like it are found in other federal statutes creating agencies that participate in commercial activity. These statutes allow the agency to be sued but specifically provide that "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [agency] or [its] property." *See* 19 U.S.C. § 1920; 42 U.S.C. § 3211(a)(13); 15 U.S.C. § 714b(c); 19 U.S.C. § 2350; 7 U.S.C. 1506(d); 20 U.S.C. § 1082(a)(2). As the United States Claims Court explained, *see Related Industries, Inc. v. United States*, 2 Cl.Ct. 517, 522 (1983), Congress began including such language in its statutes after the Supreme Court decided *Federal Housing Administration v. Burr*, 309 U.S. 242 (1940). In that case, the Court held that a clause allowing the Federal Housing Administration to sue and be sued rendered it subject to a state-law garnishment action. The Court reasoned that "it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued', that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." *Id.* at 245. The Court indicated that, if Congress intends to limit the kinds of relief available against an agency that acts in commerce, it must do so clearly. *Id.* Thus, after *Burr*, Congress began specifying that certain agencies that participated in commerce are not subject to attachment, injunction, garnishment, and similar process.

As the First Circuit has recognized, this limitation on garnishment and similar process was "intended to keep creditors or others suing the government from hindering and obstructing agency operations through mechanisms such as attachment of funds." *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1056–57 (1st Cir. 1987). It was not intended to render the agency immune from injunctive relief in situations where the agency has exceeded its statutory authority and where an injunction would not interfere with the agency's internal operations. *Id.* at 1057. Indeed, if provisions such as § 634(b)(1) meant that the agency could never be enjoined, then an agency could adopt unconstitutional policies and continue to follow them even after a court declared them unconstitutional. For example, the SBA could adopt a policy stating that it will extend small business loans only to companies owned by white men. If § 634(b)(1) means that the SBA may never be enjoined, then a court could not enjoin this policy, even though it would be blatantly unconstitutional.

In the present case, the plaintiffs only seek to set aside unlawful agency action. They do not seek to attach the SBA's assets or otherwise interfere with its internal operations. Under the injunction the plaintiffs seek, the SBA would have to do no more than process the plaintiffs' loan applications in the same manner that it processes the applications of other small businesses. Section 634(b)(1) does preclude the court from entering such an injunction.

### III. PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a plaintiff must first show that: (1) without such relief, it will suffer irreparable harm before final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of success on the merits.

*E.g., Courthouse News Service v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). If a plaintiff makes such a showing, the court must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one. *Id.* This assessment is made on a sliding scale: The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor. *Id.* Finally, the court must ask whether the preliminary injunction is in the public interest, which means considering what effect an injunction will have on non-parties. *Id.* Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted. *Id.*

## A.     Likelihood of Success on the Merits

The merits of this case present three key questions: (1) Does the SBA regulation rendering businesses that present live performances of a "prurient sexual nature" ineligible for SBA loans apply to the plaintiffs? (2) Is that regulation within the scope of the authority Congress delegated to the SBA under the CARES Act or the Small Business Act? (3) Assuming that the answer to the first two questions is yes, does the regulation violate either the Free Speech Clause of the First Amendment or the equal-protection component of the Fifth Amendment's Due Process Clause?

To answer these questions, the court must know something about why the SBA decided to exclude businesses that present live performances of a prurient sexual nature from its business loan programs—programs in which nearly every other form of small business in the United States may participate. The SBA's purpose in enacting this exclusionary regulation informs its meaning, and it would shed light on whether the regulation coincides with the goals Congress had in mind when it passed the enabling

9

statutes. The SBA's purpose is also relevant to the constitutional issues. Under the First Amendment, the SBA may not refuse to fund an otherwise eligible business simply because the business engages in a disfavored form of protected expression. However, the SBA may refuse to extend loans to businesses that do not fit within the purpose of the loan program. And under an equal-protection analysis, the SBA may make distinctions among small businesses only if the distinctions are rationally related to a legitimate governmental purpose.

Although the purpose of the SBA regulation is highly relevant to this case, the government has made no serious effort to identify it. Instead, the government vaguely asserts that "[t]he SBA adopted this rule in furtherance of its statutory mandate to consider the public interest when directing its limited resources." Br. in Opp. at 1–2., ECF No. 11. But presumably everything the government does is in the public interest. Thus, a naked reference to the public interest says nothing about the regulation's purpose. To understand the regulation's purpose, we must know *why* the SBA thinks that it serves the public interest. The government's brief is silent on that point.

The government has, however, identified the purposes of the Paycheck Protection Program and the Small Business Act—the laws that confer authority on the SBA to enact regulations such as the one at issue here. As every contemporary reader of this opinion likely knows, the PPP was "enacted to extend relief to small businesses experiencing economic hardship as a result of the public-health measures being taken to minimize the public's exposure to the COVID-19 virus." Br. in Opp. at 6 (citing PPP Interim Final Rule, 85 Fed. Reg. at 20,811). And the purpose of the Small Business Act "is to 'aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns,' in

order to preserve the system of free competitive enterprise that is 'essential' to the economic well-being and security of the Nation." *Id.* at 3 (quoting 15 U.S.C. § 631(a)).

The plaintiffs are small businesses experiencing economic hardship because of COVID-19. Like any other small business forced to close its doors to prevent the virus from spreading, the plaintiffs will find it harder to make payroll and pay their rent and utility bills now that their usual sources of revenue are temporarily unavailable. Thus, the broad purposes of both the CARES Act and the Small Business Act would be served by allowing the plaintiffs to participate in the program on the same terms as any other small business. Moreover, neither the CARES Act nor the Small Business Act creates classifications of small businesses or deems certain forms of small businesses to be less deserving of the government's "limited resources" than others. Indeed, the SBA understands the PPP to be "first-come, first-served" and has made no attempt to prioritize loans to certain types of small businesses. *See* 85 Fed. Reg. at 20,813. In short, one can find nothing in either the CARES Act or the Small Business Act to suggest that Congress wanted to exclude the plaintiffs from the PPP because of the nature of their business.

With these observations in mind, I turn to the specific legal questions this case presents.

### 1. Whether the plaintiffs present performances of a "prurient sexual nature"

The parties agree that the only reason the plaintiffs' applications for PPP loans were denied was because they were deemed ineligible for loans under the SBA regulation at issue. In relevant part, that regulation provides as follows:

The following types of businesses are ineligible:

. . . .

11

(p) Businesses which:

> (1) Present live performances of a prurient sexual nature; or

> (2) Derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature.

13 C.F.R. § 120.110(p).

The plaintiffs contend that the erotic dance entertainment they offer is not "prurient." More specifically, they allege that their entertainment is "non-obscene (and not prurient), appeals to healthy human interests and desires, and is in full compliance with the numerous licenses and permits" that they must hold under local law. See Camelot Compl. ¶ 404; Olson Decl. ¶ 10; *see also* Schuster Compl. ¶¶ 40–45. Thus, one of the central issues in this case is whether the plaintiffs' entertainment is of a "prurient sexual nature." If it is not, then the plaintiffs are certain to succeed on the merits of their claims, for the regulation would not disqualify them from loan eligibility. Oddly, however, the government states in its brief that it "takes no position at this time regarding whether the performances offered by Plaintiffs is [sic] obscene, prurient—or, as Plaintiffs put it, 'erotic but not obscene[.]'" Br. in Opp. at 14. But if the government takes no position on whether the plaintiffs' entertainment is "prurient," then it cannot take the position that the regulation disqualifies them from participation in the PPP. Unless their entertainment is prurient, the regulation does not apply.

Perhaps what the government meant to say was that it believes the plaintiffs' entertainment is *at least* prurient, but it takes no position on whether the plaintiffs' entertainment is also obscene. (Obscenity receives no First Amendment protection. *See Miller v. California*, 413 U.S. 15, 23–24 (1973).) Still, the government makes no attempt

to show that the entertainment the plaintiffs offer is of a prurient sexual nature. Not one sentence of the government's brief is used to disagree with the plaintiffs' assertion that the entertainment they offer is not prurient. The government does not, for example, contend that all forms of nude and semi-nude dancing are prurient or that the kinds of nude and semi-nude performances the plaintiffs offer are prurient. Nor does the government respond to the plaintiffs' contention that, to be prurient, a work or performance must appeal to a shameful, morbid, and unhealthy interest in sex, as opposed to a normal, healthy sexual desire. Pl. Br. at 17, ECF No. 11-1 (citing *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498–99 (1985); *Roth v. United States*, 354 U.S. 476, 487 n.20 (1957)). Essentially, the government strenuously argues that the Constitution allows the SBA to choose not to subsidize the plaintiffs' expression, but it does not pause to address the threshold issue of whether the SBA has actually made that choice through its regulation.

The government does note that, when the SBA published the regulation in the Federal Register, it stated that "an establishment featuring nude dancing . . . would not be eligible for SBA financial assistance" if such dancing was responsible for a significant portion of the establishment's gross revenue. 60 Fed Reg. at 64,360. But the government does not attempt to show that the meaning of "live performances of a prurient sexual nature" encompasses all forms of nude dancing or the specific forms of dancing offered by the plaintiffs. Indeed, some of the plaintiffs offer only semi-nude dancing—in which the dancers wear at least pasties and G-strings. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571 (1991) (holding that municipality may require erotic dancers to don pasties and

13

G-strings, which makes erotic expression "less graphic"). The government does not argue that this "less graphic" form of erotic dance entertainment is prurient.

Because the government has not developed an argument showing that the plaintiffs present live performances of a prurient sexual nature (or otherwise fit within the language of 15 C.F.R. § 120.110(p)), I conclude that, for this reason alone, the plaintiffs are likely to succeed on the merits of their claims.[1]

2.    **Whether the regulation exceeds the statutory authority granted the SBA by the CARES Act and the Small Business Act**

The plaintiffs argue that the SBA lacks authority to limit the type of small businesses that are eligible for PPP loans. The plaintiffs correctly note that no provision of the CARES Act relating to the PPP creates classifications of small businesses or provides that certain kinds of small businesses are not within the scope of the PPP. Indeed, the purpose of the CARES Act, as stated in Title I, is "keeping workers paid and employed." To achieve that end, Congress decided to make favorable loans to all small businesses to assist them in making payroll and paying rent and utility bills. Congress did not single out any industry for ineligibility under the PPP, much less specify that sexually oriented businesses are ineligible for PPP loans. Such business must make payroll and pay rent and utility bills, just like any other business. Their contributions to the national

---

[1] The plaintiffs also contend that the regulation is unconstitutionally vague. Because the government has not developed an argument showing that the regulation applies to the plaintiffs, I do not discuss the vagueness claim in detail. However, the government's failure to define "prurient sexual nature" does present vagueness issues. Aside from the problem in identifying live performances of a prurient sexual nature, the regulation also presents the problem of identifying "products" that are of a prurient sexual nature. *See* 13 C.F.R. § 120.110(p)(2). For example, does this provision bar small businesses that sell adult sex toys from obtaining PPP loans?

economy are no different than the contributions made by small businesses in other industries.

The government contends that because Congress, in creating the PPP, specifically removed some conditions that would ordinarily apply to SBA loans under §7(a) of the Small Business Act, it must have intended for the SBA to enforce all other conditions, including the ineligibility of businesses that offer goods or services of a prurient sexual nature. However, most of the conditions that Congress removed were conditions that appeared in the Small Business Act itself, rather than in the SBA regulations. For example, the § 7(a) business loan program ordinarily applies only to "small business concern[s]." 15 U.S.C. § 636(a). For purposes of the PPP, however, Congress specified that "in addition to small business concerns," the PPP applies to nonprofits, sole proprietorships, and independent contractors, among other organizations that do not ordinarily qualify as small business concerns. *See* 15 U.S.C. § 636(a)(36)(D). Another example is the "credit elsewhere" provision of Section 7(a), 15 U.S.C. §§ 632(h), 636(a)(1)(A)(i). In the CARES Act, Congress provided that PPP loan applicants are not subject to the requirement that they demonstrate that they are unable to obtain credit elsewhere. 15 U.S.C. § 636(a)(36)(I).

To be sure, the CARES Act occasionally identifies specific provisions in the Code of Federal Regulations and states that they shall not apply to the PPP. For example, the CARES Act waives certain affiliation rules that would otherwise apply under 13 C.F.R. § 121.103. *See* 15 U.S.C. § 636(a)(36)(D)(iv). But this does not give rise to an inference that, when it enacted the PPP, Congress combed through all SBA regulations applicable to §7(a) and determined that any regulation that it did not expressly override was

15

consistent with the purposes of the CARES Act. And given Congress's clear intent to extend PPP loans to all small businesses affected by the pandemic and the government's failure to identify any legitimate purpose behind the SBA's exclusion of sexually oriented businesses, it seems highly unlikely that Congress intended the SBA to apply its exclusion to the PPP.

The same result obtains under the Small Business Act. Nothing in that Act suggests that Congress authorized the SBA to enact a regulation excluding small businesses in certain industries from the SBA's business loan program. To the contrary, the Small Business Act authorizes the SBA to "make loans to *any* qualified small business concern." 15 U.S.C. § 636(a). Congress then expressly identified the "restrictions, limitations, and provisions" that govern the SBA's power to make business loans to any small business. *Id.* No such restriction, limitation, or provision states that the SBA has power to render an entire class of small businesses ineligible for its business loan program.

Perhaps if the government had identified some purpose of either the CARES Act or the Small Business Act that is furthered by the SBA's exclusion of businesses that sell goods or services of a prurient sexual nature, I could find that Congress granted the SBA authority in one of these laws to enact the regulation at issue. But the government has not done so. Instead, it offers only the vague assertion that excluding such businesses from its loan programs serves the public interest. Accordingly, I conclude that 13 C.F.R. § 120.110(p) serves no statutory purpose and exceeds the scope of the regulatory authority Congress granted the SBA in the CARES Act and the Small Business Act. *See, e.g., Campbell v. Galeno Chem. Co.*, 281 U.S. 599, 610 (1930) ("The limits of the power

16

to issue regulations are well settled. They may not extend a statute or modify its provisions.").

### 3. Whether the regulation is unconstitutional

As explained above, the SBA has not shown that its regulation applies to the plaintiffs or that, if it does, Congress granted the SBA authority to issue a regulation excluding sexually oriented businesses from the PPP or its other business loan programs. However, for purposes of addressing the plaintiffs' constitutional claims, I will assume that the regulation applies to the plaintiffs and that Congress granted the SBA authority to exclude sexually oriented businesses from its loan programs.

Turning to these constitutional claims, I begin by reiterating that nude dancing is a form of expression protected by the First Amendment. *See, e.g., Schad*, 452 U.S. at 66; *Schultz v. City of Cumberland*, 228 F.3d 831, 839 (7th Cir. 2000). Thus, Congress could not flatly prohibit the plaintiffs from offering erotic dance entertainment. As the government notes, however, under the Spending Clause of the Constitution, Congress may sometimes place speech-related conditions on the receipt of federal funds. *See, e.g., Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). This is so, because, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Id.* at 214. However, Congress's power to place conditions on federal funding is not limitless. The Supreme Court has held that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The Court wrote that "if the government could deny a benefit to a person because of his constitutionally protected speech or

associations, his exercise of those freedoms would in effect be penalized and inhibited." *Id.* Moreover, Congress cannot "discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.'" *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 548 (1983) (quoting *Speiser v. Randall*, 357 U.S. 513, 519 (1958)).

In the present case, the plaintiffs contend that the SBA has denied them a benefit—participation in the PPP—on the ground that they have exercised their constitutional right to present erotic dance entertainment as part of their business. The government contends that this is not so. Instead, it contends, it has merely elected not to subsidize the plaintiffs' expressive activities. The government relies on the Supreme Court's statement that "although government may not place obstacles in the path of a [person's] exercise of . . . freedom of [speech], it need not remove those not of its own creation." *Regan*, 461 U.S. at 549–50 (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)). Here, the government notes that the obstacle preventing the plaintiffs from presenting the quantity of erotic dance entertainment they wish to present is the COVID-19 pandemic, not the federal government. Therefore, the government contends, the government has no obligation to remove the obstacle by allowing the plaintiffs to participate in the PPP.

The obvious flaw in the government's reasoning is that it has chosen to remove the COVID-19 obstacle from the path of nearly every other small business in the United States. In leaving the obstacle in the plaintiffs' path, the government has singled them out for unfavorable treatment based solely on the content of their speech. Moreover, the government has not articulated any legitimate governmental interest that might be served by excluding the plaintiffs from the PPP. As explained below, in the cases on which the

government relies, the Supreme Court allowed Congress to make content-based distinctions in its funding programs only when those distinctions were either related to the purpose of the funding program or were rationally related to another legitimate governmental interest. Here, the purpose of the funding program is to make favorable loans to all small businesses to help them survive the economic crisis brought on by the COVID-19 pandemic. The funding program has no "message," and the government cannot point to any legitimate purpose that would be served by denying the plaintiffs access to the program. Thus, the Constitution does not permit the SBA to exclude the plaintiffs from the PPP based on the content of their speech.

One of the government's cases is *Rust v. Sullivan*, 500 U.S. 173 (1991). That case involved Title X of the Public Health Service Act, which provided federal funding for family-planning services. *Id.* at 178. The Act provided that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* This provision was intended to ensure that Title X funds were used only to support "preventative family planning services, population research, infertility services, and other related medical, informational, and educational activities." *Id.* at 178–79. To implement this provision, the Department of Health and Human Services issued regulations that imposed certain conditions on the grant of federal funds. Among those conditions was a requirement that the fund recipient not provide counseling concerning the use of abortion as a method of family planning or otherwise "encourage, promote or advocate abortion as a method of family planning." *Id.* at 179–80. Some participants in the funding program challenged these regulations on the ground that they impermissibly discriminated on the basis of viewpoint by prohibiting all discussion about abortion and

requiring fund recipients to provide information about continuing a pregnancy to term. *Id.* at 192.

The Supreme Court held that the funding condition did not violate the First Amendment. Crucial to the Court's holding was its recognition that Congress had a specific, lawful purpose in mind when it set up the funding program, which was to promote "family planning services which will lead to conception and childbirth." *Id.* at 192–93. In the government's view, abortion was inconsistent with that purpose, and thus it chose not to authorize participants to use program funds to advocate for abortion. The Supreme Court recognized that the government had not discriminated on the basis of viewpoint but had "merely chosen to fund one activity to the exclusion of the other." *Id.* at 193. The regulations were "designed to ensure that the limits of the federal program [were] observed." *Id.* Said the Court: "This is not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside the project's scope." *Id.* at 194. The Court noted that Congress could fund a program dedicated to advancing certain permissible goals without also funding alternative goals. Thus, when Congress established the National Endowment for Democracy to encourage other countries to adopt democratic principles, it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism. *Id.* The Court observed that "we have here not a case of a general law singling out a disfavored group on the basis of speech content, but a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded." *Id.* at 194–95.

Unlike the statute in *Rust*, neither the CARES Act nor the Small Business Act has a permissible goal that would be undermined by allowing sexually oriented small businesses to participate in the PPP on the same terms as other small businesses. The goal of the CARES Act is to extend a lifeline to all small businesses, not to promote or encourage any specific subset of small businesses. And the purpose of the Small Business Act is to strengthen the economy by assisting all small businesses. Thus, unlike in *Rust*, we have here "a case of a general law singling out a disfavored group on the basis of speech content." *Id.* at 194. For this reason, the SBA regulation appears to be aimed at suppressing what the government deems to be a dangerous (or at least disfavored) idea, namely, dancing that conveys an erotic message.

This is not to say that if the government chose to establish a small-business loan program designed to encourage a certain form of small business, it would be compelled to establish a similar program for sexually oriented businesses. For example, Congress or the SBA might establish a loan program designed to promote dinner theaters without being compelled to establish a similar program for strip clubs. But Congress has done nothing along those lines in either the CARES Act or the Small Business Act. Accordingly, the SBA's content discrimination cannot be upheld on the theory that the government is trying to "ensure that the limits of the federal program are observed." *Id.* at 193. As the Supreme Court has said, "Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 547 (2001).

The case on which the government most heavily relies is *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983). In that case, a nonprofit organization

challenged § 501(c)(3) of the tax code to the extent that it prohibited tax-exempt organizations from using tax-deductible contributions to support lobbying activities. The plaintiff alleged that the prohibition on lobbying violated both the First Amendment and the equal-protection component of the Fifth Amendment's Due Process Clause.

In connection with its First Amendment argument, the plaintiff argued that the ban on lobbying imposed an unconstitutional condition on the receipt of tax-deductible contributions. The Court disagreed, reasoning that "Congress has merely refused to pay for lobbying out of public moneys." *Id.* at 545. The Court stated that it "has never held that [Congress] must grant a benefit . . . to a person who wishes to exercise a constitutional right." *Id.* However, the Court made clear that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.'" *Id.* at 548. The Court recognized that because Congress prohibited all lobbying (with the exception of lobbying by veterans' organizations), it had not engaged in viewpoint discrimination or tried to suppress a particular idea.

The present case is different from *Regan* because, here, the SBA has targeted a much narrower form of expressive activity. Lobbying, of course, embraces a wide variety of viewpoints. Although it is perhaps inaccurate to say that nude dancing is a viewpoint, it is a form of expression that, unlike lobbying, inherently conveys a specific message. *See Schultz v. City of Cumberland*, 228 F.3d 831, 847 (7th Cir. 2000) ("The dominant theme of nude dance is 'an emotional one; it is one of eroticism and sensuality.'"). Thus, excluding erotic entertainment from a generally available loan program could well be characterized as an attempt to suppress a disfavored expressive message. Indeed, if the

22

SBA could target sexually oriented businesses in the way it has here, then Congress could revise the tax code to exclude them from every deduction available to other businesses, such as the deduction for ordinary and necessary business expenses. *See* 26 U.S.C. § 162(a). Such a revision would undoubtedly be an attempt to suppress a disfavored form of protected expression rather than a mere refusal to subsidize the exercise of a constitutional right. The same is true of the SBA's attempt to exclude sexually oriented businesses from its loan programs.

A related point is that the SBA has not pointed to any legitimate governmental purpose to justify its singling out of sexually oriented businesses. In *Regan*, the plaintiff advanced an equal-protection claim in addition to a First Amendment claim. To resolve the equal-protection claim, the Court examined whether the exclusion of lobbying bore "a rational relation to a legitimate governmental purpose." 461 U.S. at 547. The Court found that the law did serve such a purpose, which was preventing tax-exempt organizations from using "tax-deductible contributions to lobby to promote the private interests of their members." *Id.* at 550.[2] Here, however, the government has not identified a legitimate governmental purpose for its exclusion. As noted, the government only vaguely refers to the public interest without explaining how its exclusion serves the public interest.

The government also states that it was "not irrational of the SBA to decide that it would not be worth the commitment of its finite resources to subsidize additional speech of a prurient sexual nature, which lies at the outer perimeters of the First Amendment." Br. in Opp. at 222. But the PPP and the Small Business Act do not subsidize speech, they

---

[2] The Court also determined that Congress's decision to allow veterans' organizations to deduct contributions used for lobbying did not violate equal-protection principles because favoring veterans is a legitimate governmental purpose. *Regan*, 461 U.S. at 550–51.

subsidize small businesses. The fact that the plaintiffs engage in speech as part of their small business is not relevant to the purposes of either program. Neither the CARES Act nor the Small Business Act directs the SBA to determine whether some expression is more deserving of the government's assistance than others. *Cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585 (1998) (noting that Congress must take artistic merit into account when making grants under the National Foundation on the Arts and the Humanities Act). By using the plaintiffs' expression as a reason to exclude them from the program, the SBA has introduced content discrimination into programs that were designed to be indifferent to speech. If the SBA could identify some legitimate governmental purpose for doing this, then perhaps the regulation could withstand an equal-protection challenge. But the only apparent purpose for this regulation is to exclude small businesses that express a disfavored message from programs that were created to assist all small businesses. Because that is not a *legitimate* governmental purpose, the SBA's distinction violates equal-protection principles.[3]

---

[3] The failure of the SBA to demonstrate a rational connection to a legitimate purpose is also a reason to invalidate the SBA regulation under the Administrative Procedure Act. *See* 5 U.S.C. § 706. Indeed, the case under the APA is even stronger than the case under the Constitution, for under the APA it is not enough that the court be able to conceive of a rational basis for the regulation, which is usually enough to sustain a statute evaluated under rational-basis review. *See Schurz Commc'ns, Inc. v. FCC*, 982 F.2d 1043, 1049 (7th Cir. 1992). Under the APA, the statement accompanying the regulation "must demonstrate that a reasonable person upon consideration of all the points urged pro and con the rule would conclude that it was a reasonable response to a problem that the agency was charged with solving." *Id.* In the present case, the SBA's statement accompanying the regulation says nothing more than that it considers the rule "to be consistent with its obligation to direct its limited resources and financial assistance to small businesses in ways which will best accomplish SBA's mission, serve its constituency, and serve the public interest." 60 Fed. Reg. at 64,360. Again, however, the SBA fails to explain *why* singling out sexually oriented businesses for unfavorable treatment best accomplishes its mission, serves it constituency, or serves the public

For these reasons, I conclude that the plaintiffs have a high likelihood of success on their claim that § 120.110(p) violates the First Amendment and the equal-protection component of the Fifth Amendment's Due Process Clause.

**B.    Irreparable Harm/Lack of an Adequate Remedy at Law**

I also find that the plaintiffs lack an adequate remedy at law and that they would suffer irreparable harm without an injunction. Harm is irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008)). To show that there is no adequate remedy at law, the plaintiff is not required to demonstrate that the remedy would be wholly ineffectual; the plaintiff must show only that any award would be seriously deficient as compared to the harm suffered. *Id.* at 1046 (citations and quotations omitted).

Initially, I note that the government does not concede that it could be held liable for damages at the end of this case. Ordinarily, the federal government and its officials sued in their official capacities (as they are sued here) have sovereign immunity from damages. *See, e.g., FDIC v. Meyer*, 510 U.S. 471, 475 (1994). No party has suggested that the federal government has waived its sovereign immunity from damages under the present circumstances. Moreover, the Tenth Circuit has held that the Small Business Act's sue-and-be-sued clause, 15 U.S.C. § 634(b)(1), does not render the SBA liable for damages in a suit involving the SBA's refusal to guarantee a small business loan. *See Ascot Dinner*

---

interest. Thus, even if I could conceive of a legitimate reason for the regulation (and I cannot), the regulation would be invalid under the APA.

*Theatre, Ltd. v. Small Bus. Admin.*, 887 F.2d 1024, 1027–28 (10th Cir. 1989). Thus, I assume for purposes of this motion that the plaintiffs could not obtain damages for any harm caused by the SBA's refusal to guarantee their loans. The plaintiffs therefore lack an adequate remedy at law. Moreover, the inability to obtain damages implies that any harm the plaintiffs suffer between now and the end of the case will be irreparable. *See Smith v. City of Hammond, Ind.*, 388 F.3d 304, 307 (7th Cir. 2004) (noting that in some cases "a defendant's immunity from damages liability might constitute irreparable harm entitling the plaintiff to preliminary relief").

The plaintiffs certainly will suffer irreparable harm if the SBA is not preliminarily enjoined to continue reserving guarantee authority for their loans. As noted, the PPP is administered on a first-come, first-served basis. Once the funds Congress appropriated for the PPP are exhausted, the SBA will be unable to guarantee further loans. Congress's initial allocation of $349 billion was exhausted in two weeks. Although the fund has been replenished, the current allocation will almost certainly be exhausted by the time this case is litigated to conclusion. And while the temporary restraining order currently in place preserves guarantee authority for the plaintiffs' loans, denying a preliminary injunction would necessarily involve dissolving that order. The SBA could then use the guarantee authority for other applicants. Thus, without a preliminary injunction, the plaintiffs will almost certainly suffer irreparable harm in the form of being permanently excluded from the PPP.

The plaintiffs have also shown that they will suffer irreparable harm if the SBA is not compelled to immediately transmit guarantee authority to their lenders so that the lenders can disburse the funds. The loss of First Amendment freedoms is presumed to

constitute irreparable injury for which money damages are inadequate. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (citing *Joelner v. Vill. of Washington Park, IL*, 378 F.3d 613, 620 (7th Cir. 2004)); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507 (7th Cir. 1998) ("[Plaintiff] lacks an adequate remedy at law as any post-election remedy would not compensate it for the loss of the freedom of speech."). Here, the *Camelot* plaintiffs have shown that their inability to obtain a loan through the PPP will prevent them from exercising their First Amendment right to present erotic dance entertainment. They filed a declaration stating that they are currently presenting such entertainment through a live streaming platform three nights a week for three hours at a time. *See* Zubke Decl., ECF No. 24. The plaintiffs themselves receive no income from the live stream. However, individual dancers (who are not employees of the plaintiffs) perform on these live streams, and they receive tips from viewers. To present this streaming service, the plaintiffs invested in equipment and web-hosting services. They also pay three employees (a DJ, a manager, and an IT person) an hourly wage to facilitate the live stream. With their current lack of revenue, the plaintiffs can afford to live stream the entertainment on only three evenings a week for three hours at a time. They assert that if they do not receive a PPP loan soon, they will have to discontinue even this limited amount of expression. Based on this evidence, I conclude that, without an injunction requiring the SBA to guarantee their loans, the plaintiffs will suffer irreparable harm in the form of being unable to engage in protected expression between now and when the case is finally resolved on the merits.

27

The plaintiff in *Schuster* has not presented erotic dance entertainment through a live stream, and it does not express an intent to do so. Thus, it does not propose to use PPP funds to facilitate such expression. However, I conclude that it will suffer irreparable harm if it does not receive a PPP loan soon. Although economic loss generally will not sustain a preliminary injunction, an award of damages can be inadequate if the damage award would come "too late to save the plaintiff's business." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *see also*, *Girl Scouts of Manitou Council*, 549 F.3d at 1090, 1095 (finding "the potential loss of property, employees, or its entire business" to pose enough risk of irreparable harm); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (irreparable harm found where potential losses "would drive [movant] out of business within six months"). In accordance with Wisconsin's "Safer at Home" order, the plaintiff's club has been closed since March 17. Under Wisconsin's current plan for reopening the economy, the earliest the club could reopen (at reduced capacity) is May 26. Since March 17, the plaintiff has earned no revenue; any revenues earned after reopening will likely be a small fraction of what they would have been under normal circumstances. Revenue and sales for the months of March, April, and May will likely be just 10% of revenue generated for the same months in 2019. The plaintiff intends to use funds received through the PPP to pay payroll, benefits, rent/mortgage, and utilities. It has been unable to obtain a loan from another lender. The plaintiff expects that, without a PPP loan, its business will not survive.

Based on these facts, I am satisfied that the *Schuster* plaintiff has demonstrated irreparable harm based on the likelihood that it will go out of business without a PPP loan. While the current pandemic has been harsh on the entire economy, restaurants and

businesses that present live entertainment have been hit especially hard because in-person gatherings are forbidden. These businesses will be among the last to return to full and normal operations. Finally, as a general matter, it is reasonable to infer that *any* small business, regardless of the services and/or products it provides, would have trouble surviving if forced to close its doors for two months followed by a limited, piecemeal reopening.

**C.     Balance of Harms & Public Interest**

Under the balance of harms, I must consider any harm that the defendants might suffer from an injunction. Here, the only conceivable harm the defendants could suffer would be guaranteeing a loan to a small business that turned out not to be eligible for such a guarantee because it engaged in a form of expression that the SBA did not wish to fund. But, in the context of the PPP, this is not a substantial harm. The purpose of the PPP is to extend loans to small businesses so that they can pay employees and otherwise finance their operations until the mass closures required by the COVID-19 pandemic have ended. As I have explained in this opinion, that purpose would be served by the SBA's guaranteeing the plaintiffs' loans. Moreover, if the SBA did not guarantee the plaintiffs' loans, it almost certainly would immediately use the same guarantee authority on loans for other small businesses. Thus, an injunction requiring the SBA to guarantee the plaintiffs' loans would not cause the SBA any financial loss. With or without an injunction, the SBA would be using the same appropriations to guarantee loans during the same time period. The only difference would be the identity of the borrower. But so long as the borrower is a small business, the SBA should not care about its identity. Perhaps being required to guarantee a loan to a business that the SBA would rather not fund is a harm,

Case 2:20-cv-00601-LA   Filed 05/01/20   Page 29 of 33   Document 28

but in the context of the PPP, this could only be described as *de minimis* harm. It certainly does not outweigh the harm that the plaintiffs would suffer without an injunction, especially considering that they are highly likely to succeed on the merits of their claims.

Moreover, I conclude that the public interest favors an injunction. As noted, the purpose of the PPP is to extend help to small businesses now, while the mass closures caused by the COVID-19 pandemic are in effect. Guaranteeing the plaintiffs' loans now, rather than months from now when this case is over, furthers the public interest in helping all small businesses and their employees get through the pandemic. The government notes that because PPP appropriations are limited, guaranteeing the plaintiffs' loans will necessarily prevent the SBA from guaranteeing loans to third parties using the same appropriations. The government contends that these third parties would be harmed by an injunction. Although that is true, the plaintiffs' high likelihood of success on the merits makes up for this potential harm. That is, because the plaintiffs have shown that they likely should have received PPP loans when they applied, any harm to the third parties who applied after them and who would have received loans if the plaintiffs' applications were denied is warranted.

## D.    Bond

Finally, I must consider whether the plaintiffs are required to post a bond under Federal Rule of Civil Procedure 65(c), which provides that the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." However, if there is "no danger that the opposing party will

incur any damages from the injunction," then the court does may dispense with the bond. *See Habitat Educ. Ctr v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).

Here, I find that the defendants will not incur damages from the injunction. As explained above, the purpose of the PPP is to extend loans to small businesses now, while the mass closures required by the COVD-19 pandemic are ongoing. But for the injunction, the defendants would use the guarantee authority reserved for the plaintiffs to guarantee loans to other small businesses. The total cost to the defendants of guaranteeing the loans is the same whether the borrowers are the plaintiffs or third parties. Thus, the injunction does not require the defendants to incur costs that they would not incur in the absence of the injunction. Only the identity of the borrower is different. But the identity of the borrower does not increase the government's costs.

If the plaintiffs ultimately lose this case, the defendants might demand that the plaintiffs immediately repay the amount of the loans rather than receive loan forgiveness under Section 1106 of the CARES Act. If, at that point, the COVID-19 crisis was over and the PPP had expired, then the SBA might reap a financial benefit because it could return the money to its general appropriations or to the United States treasury rather than lend it to a different PPP applicant. However, requiring the plaintiffs to repay the loans after they used the proceeds in a way that qualified them for loan forgiveness would be a windfall to the government, not compensation for harm caused by the injunction. In that case, the plaintiffs would have used the loan proceeds during the COVID-19 crisis and, in doing so, have furthered the governmental purpose behind the PPP. The government thus would have received the desired "return" on its investment—small businesses would have used PPP loans to stay in business and pay employees during the crisis. But if, after

the crisis was over, the government insisted that the plaintiffs repay the loans rather than receive loan forgiveness, the government would receive an additional benefit. This additional benefit would be made possible only by the injunction—for, as noted, but for the injunction the government would have immediately guaranteed a loan to another applicant who would have been eligible for loan forgiveness. Thus, the loss of this additional benefit would not be a loss caused by the injunction.

For these reasons, I conclude that there is no danger of the defendants' incurring costs or damages from the injunction, and therefore I will not require the plaintiffs to post a bond.

### IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiffs' motions for a preliminary injunction (ECF No. 8 in Case No. 20-C-0601 and ECF No. 3 in Case No. 20-C-0634) are **GRANTED**. The Administrator of the U.S. Small Business Administration and the Secretary of the Treasury, as well as their employees, agents and representatives, including the SBA's lending banks, are preliminarily enjoined from using 13 C.F.R. § 120.110(p) and the associated SBA Standard Operating Procedure (SOP 50 10 5(K) § III.A.15) in making eligibility determinations for loans under 15 U.S.C. § 636(a)(36). By **Monday, May 4, 2020, at 12:00 p.m.**, the Administrator of the U.S. Small Business Administration and the Secretary of the Treasury shall transmit guarantee authority to the plaintiffs' lenders so that those lenders may finish processing the plaintiffs' applications for PPP loans and immediately fund the loans.

**IT IS FURTHER ORDERED** that J.R. Schuster LLC's motion for leave to file excess pages is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 1st day of May, 2020.

s/Lynn Adelman
LYNN ADELMAN
District Judge